UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO.: 19-cv-60241-JMS

RAYDEL MARTINEZ and
DARNETH DOMINGUEZ,

      Plaintiffs,

v.

CWC TRANSPORTATION, LLC,
CARLOS ASSAYAG, and WILLIAM
MASARO,

      Defendants.

_____/

**<u>ORDER</u>**

THIS CAUSE came before the Court on the parties' cross-motions for summary judgment. (DE 60, 61). Upon review of the record, the parties' briefs, and the relevant legal authorities, the Court **denies** Plaintiffs' motion (DE 60) and **grants** Defendants' motion (DE 61).

**I.      Background**

**A.      Procedural Background**

Plaintiffs brought this action under the Fair Labor Standards Act, 29 U.S.C. § 201 *et. seq.* ("FLSA") for overtime wage violations and federal minimum wage violations[1] (DE 46).

On January 24, 2020, Plaintiffs filed Plaintiffs' Motion for Partial Summary Judgment ("Plaintiffs' MSJ") (DE 60) seeking judgment as a matter of law that the Motor Carriers Act Exemption, 29 U.S.C. § 213(b)(1), does not apply to exempt Plaintiffs from the overtime wage

---

[1] Plaintiffs acknowledge that they have abandoned any and all claims pertaining to alleged federal minimum wage violations (DE 62, ¶ 56; DE 66, ¶ 56).

requirements of the FLSA.  Plaintiffs' MSJ includes Defendants' answers to interrogatories (DE 60-1; DE 60-2) and Defendants' expert report ("Expert Report") (DE 60-3).  Also, on January 24, 2020, Plaintiffs filed Plaintiffs' Statement of Material Facts in Support of Motion for Summary Judgment ("Plaintiffs' SOF") (DE 59), and a Notice of Filing Transcript of Deposition of Angel Cruz (DE 58).  On January 25, 2020, the Defendants filed Defendants' Motion for Final Summary Judgment with Incorporated Memorandum of Law ("Defendants' MSJ") (DE 61) and the Defendants' Statement of Undisputed Material Facts in Support of Defendants' Motion for Final Summary Judgment with Incorporated Memorandum of Law ("Defendants' SOF") (DE 62), which included various exhibits (DE 62-1 through DE 62-7).  On February 7, 2020, Defendants filed Defendants' Response to Plaintiffs' SOF (DE 64) with various exhibits (DE 64-1 through 64-5) and Defendants' Response in Opposition with Incorporated Memorandum of Law to Plaintiffs' MSJ (DE 65).  On February 10, 2020, Plaintiffs filed Plaintiffs' Response to Defendants' SOF (DE 66) and Plaintiffs' Response to Defendants' MSJ (DE 67).  On February 14, 2020, Plaintiffs filed Plaintiffs' Reply to Defendants' Response to Plaintiffs' MSJ (DE 68).  On February 18, 2020, Defendants filed Defendants' Reply Statement of Material Facts (DE 70).  On February 19, 2020, Plaintiffs filed an untimely reply (DE 71) to Defendants' Response to Plaintiffs' SOF (DE 64) along with a motion to deem it timely (DE 72).  Defendants filed a motion to strike Plaintiffs' untimely reply on February 20, 2020 (DE 73).  This matter is now ripe for consideration.

### B.    Factual Background

The following facts are undisputed.  Defendant CWC Transportation, LLC ("CWC") is a motor carrier that transports petroleum products for hire to destinations within and outside the State of Florida (DE 62, ¶ 1; DE 66, ¶ 1).  Defendant CWC operates out of four terminals, all of which are located within Florida (DE 59, ¶ 1; DE 64, ¶ 1).  Plaintiffs worked during the relevant

time period as drivers for CWC and delivered petroleum products only from the Port Everglades facilities in Florida and only to locations within Florida (DE 59, ¶¶ 2, 5; DE 64, ¶¶ 2, 5).  In fact, all of CWC's business out of Port Everglades is solely within the State of Florida (DE 59, ¶ 10; DE 64, ¶ 10; DE 66, ¶ 66; DE 70, ¶ 66).  All of the gasoline distributed from fuel terminals at Port Everglades, however, comes from outside the State of Florida (DE 62, ¶ 13; DE 66, ¶ 13).

Defendant CWC's customers include fuel marketers or distributers, (known as "jobbers"), logistics companies, and warehouse club chains sometimes referred to as big box retailers (DE 62, ¶ 8; DE 66, ¶ 8).  These customers place orders for Defendant CWC to obtain fuel from a particular fuel terminal and deliver it on their behalf (DE 62, ¶¶ 9-11; DE 66, ¶¶ 9-11).  Defendant CWC charges its customers (e.g., "the jobbers") a freight charge for delivery of the gasoline, and the jobbers pass this charge on to the jobbers' customers (e.g., "retail gasoline stations") (DE 62, ¶¶ 10, 20; DE 66, ¶¶ 10, 20).

Major oil companies deliver gasoline to Port Everglades based on supply contracts with jobbers and big box retailers that are customers of CWC (DE 62, ¶ 14; DE 66, ¶ 14).  As an example, Pro Energy is one such jobber that is a CWC customer (DE 62, ¶¶ 15-16; DE 66, ¶¶ 15-16).  Pro Energy has contractual arrangements, called supply agreements ("Supply Agreements"), with major oil companies (DE 62, ¶ 17; DE 66, ¶ 17).  The oil companies, which contract with Pro Energy, do not have refineries in Florida; the gasoline that is subject to Pro Energy's Supply Agreements is transported into Florida via barge (DE 62, ¶ 18; DE 66, ¶ 18).  The oil companies lease storage capacity for gasoline at fuel distribution terminals within the Port Everglades facilities (DE 60-3, ¶¶ 11-13; DE 62-3, ¶¶ 11-13; DE 62, ¶ 22; DE 66, ¶ 22).  Through its Supply Agreements, Pro Energy will contract with oil companies to purchase a minimum quantity of gasoline based on customer demand projections that are determined using historical sales of

gasoline in Florida during the same time of year (DE 62, ¶¶ 19, 24; DE 66, ¶¶ 19, 24).  The Supply Agreements additionally limit the maximum volume of gasoline that Pro Energy may purchase each month; and, if Pro Energy pulls more than the maximum, the oil companies use terminal reporting systems to limit its ability to pull gasoline from the fuel terminals (DE 62, ¶¶ 25-26; DE 66, ¶¶ 25-26).  Pro Energy sells the gasoline purchased under its Supply Agreements to Florida retail gasoline stations listed in the Supply Agreements (DE 62, ¶ 20; DE 66, ¶ 20).  The oil companies have the right to terminate the Supply Agreements if Pro Energy is not supplying the retail gasoline stations listed in the Supply Agreements, and the Supply Agreements give the oil companies the right to inspect Pro Energy's books and records to verify its deliveries to the designated retail gasoline stations (DE 62, ¶¶ 28-29; DE 66, ¶¶ 28-29).  Since in or about 2007, Pro Energy has used CWC to transport gasoline from fuel terminals to retail gasoline stations (DE 62, ¶ 16; DE 66, ¶ 16).

During Plaintiffs' employment with CWC, they would arrive at Port Everglades in a truck that they operated for CWC and input CWC's customer's account information into a computer located at the fuel terminal's loading ramp (DE 62, ¶¶ 47-49; DE 66, ¶¶ 47-49).  They would have previously received instructions via a tablet as to the type and quantity of gasoline that they would be transporting, the specific terminal at Port Everglades from which they would obtain the specified gasoline, and the retail gasoline station where they would deliver the gasoline (DE 62, ¶¶ 45-46; DE 66, ¶¶ 45-46).  Plaintiffs would then attach a hose from the designated fuel terminal to the tanker that was attached to the semi-truck they were operating, and the specified type and quantity of gasoline would be loaded into the tanker (DE 62, ¶ 49; DE 66, ¶ 49).  At the same time that the gasoline would be loaded, fuel additives would also be loaded in an approximate volume of 0.25 gallons of additive per thousand gallons with the entire loading process taking about ten

minutes (DE 62, ¶¶ 50-51; DE 66, ¶¶ 50-51).  Major oil companies use a chemical trace additive that is unique to each oil company (DE 64, ¶¶ 31-33; DE 71, ¶¶ 31-33).  This chemical marker provides the oil companies with the ability to exercise their right to obtain and remove samples of gasoline to verify whether the gasoline sold to jobbers is actually delivered to the retail gasoline stations specified in the Supply Agreements (DE 62, ¶ 31; DE 66, ¶ 31).  After the trucks are loaded with fuel and additives, the fuel terminal would provide Plaintiffs with a bill of lading generated from the fuel terminal computer specifying the seller of the gasoline, the gasoline supplier or company that hired CWC, the fuel terminal from which the gasoline was pulled, the motor carrier, and the volume and quantity of gasoline pulled (DE 62, ¶¶ 52-53; DE 66, ¶¶52-53).  Plaintiffs would then drive to the designated retail gasoline station and unload the gasoline into the stations' tanks (DE 62, ¶ 54; DE 66, ¶ 54).

## II.       Legal Standards

### A.       Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A party raises an issue of genuine material fact when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant.  *See Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) (quoting *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 919 (11th Cir. 1993)).  "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment."  *Kesinger ex rel. Estate of Kesinger v. Herrington*, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, (1986)).

A party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593–94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995) (citation omitted). "Where the nonmoving party has failed to make a sufficient showing 'to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,' there exist no genuine issues of material fact." *Mize*, 93 F.3d at 742 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

## B.    The Motor Carrier Act

The FLSA requires employers to pay employees at time-and-a-half for working more than forty hours in a work week. *See* 29 U.S.C. § 207(a). The Motor Carrier Act, 29 U.S.C. § 213(b) (the "MCA"), provides an exemption from the maximum hours and overtime requirements of the FLSA. Courts should read the exemptions to the FLSA "fairly" rather than "narrowly." *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018). The burden is on the employer to show

that an exemption applies.  *Abel v. S. Shuttle Servs., Inc.*, 631 F.3d 1210, 1212 (11th Cir. 2011) (citation omitted).

Under the MCA, the FLSA's overtime provision, section 207, does not apply "to any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of Section 31502 of Title 49."  29 U.S.C. § 213(b)(1); *Alvarado v. I.G.W.T. Delivery Sys., Inc.*, 410 F.Supp.2d 1272 (S.D. Fla. 2006).  The Eleventh Circuit has explained that:

> The Secretary [of Transportation] has the power to establish qualifications and maximum hours of service for employees who (1) are employed by carriers whose transportation of passengers or property by motor vehicle is subject to the Secretary's jurisdiction under the Motor Carrier Act; and (2) engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act.

*Baez v. Wells Fargo Armored Service Corp.*, 938 F.2d 180, 181–82 (11th Cir.1991) (citing 29 C.F.R. § 782.2(a)).

Stated another way, for the MCA exemption to apply in this case, Defendants must show that:

(1) The Plaintiffs/Employees are engaged in interstate commerce[2];

(2) The Defendant Employer is a carrier that is covered by the Motor Carrier Act; and

(3) The activities of the Plaintiffs/Employees affect the safety of operation of motor vehicles.

*See* 29 C.F.R. § 782.2(a); *Walters v. Am. Coach Lines of Miami, Inc.*, 575 F.3d 1221, 1226-27 (11th Cir. 2009).

---

[2]As relevant here, interstate commerce under the Motor Carrier Act may include the intrastate transporting of out-of-state-originating commodities from a storage terminal to another location where the shipper had a fixed and persisting transportation intent beyond the terminal storage point at the time of shipment.  *See* 29 C.F.R. § 782.7(b)(1) and (2).

### III.    Analysis

#### A.    Plaintiffs' MSJ

Plaintiffs' MSJ fails for the reasons that follow.  Plaintiffs argue that, because Defendants cannot establish that Plaintiffs were engaged in interstate commerce, the MCA exemption does not apply (DE 60 at ¶¶ 4, 12-13).  According to Plaintiffs, they are not engaged in interstate commerce because there is "substantial alteration of the product [that] breaks the practical continuity of movement and separates the intrastate transportation of the product by [Plaintiffs] from the interstate transportation of the product to Port Everglades" (DE 60, ¶ 15).  Plaintiffs argue that, "[t]o apply [the MCA] to an intrastate shipment, there can be no intrastate processing or other material change to the product."  *Id.* at ¶ 12 (citing *Galbreath v. Gulf Oil Corp.*, 413 F.2d 941, 943 (5th Cir. 1969)).  Here, Plaintiffs argue that substantial modification occurs when, after the product arrives at Port Everglades, chemical markers are added to the gasoline that distinguish the gasoline of one supplier from that of another (DE 60 at ¶¶ 13-15).  Plaintiffs further argue that the chemical marker additive represents a material change because stations are prohibited contractually from buying gasoline from a different supplier, and it is the additive that distinguishes one brand of gasoline from another.  *Id.* at ¶ 15.

For the purpose of the Motor Carrier Act exemption, a carrier is engaged in interstate commerce when transporting goods across state lines or when transporting within a single state goods that are in the flow of interstate commerce.  *See Merchants Fast Motor Lines, Inc. v. I.C.C.*, 528 F.2d 1042, 1044 (5th Cir.1976)[3]; *see also* 29 C.F.R. § 782.7(b)(1).  "[P]urely intrastate

---

[3] In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981), the Eleventh Circuit adopted as binding precedent all decisions of the Fifth Circuit handed down prior to the close of business on September 30, 1981.

transportation can constitute part of interstate commerce if it is part of a continuous stream of interstate travel, [and] there [is] a practical continuity of movement between the intrastate segment and the overall interstate flow." *Walters*, 575 F.3d at 1229 (internal quotations and citations omitted). "A critical factor in determining whether there is a practical continuity of movement depends on the shipper's 'fixed and persisting intent ... at the time of shipment.'" *Ehrlich v. Rich Prod. Corp.*, 767 F. App'x 845, 848 (11th Cir. 2019) (citing 29 C.F.R. § 782.7(b)(2)). In other words, the Court looks at whether the shipper intended "to maintain the flow of the products through the facility, rather than allowing the products to languish at the facility" at the time of shipment. *Id.* (citation omitted). The Court determines this intent "from all the facts and circumstances surrounding the transportation." *Id.* (internal quotation marks and citation omitted).

The Interstate Commerce Commission ("ICC")[4] initially set forth a three-part test to assist in determining the shipper's fixed and persisting intent at the time of shipment. *See Foxworthy v. Hiland Dairy Co.*, 997 F.2d 670, 672–73 (10th Cir. 1993) (quoting *Ex Parte No. MC–48, Determination of Jurisdiction Over Transportation of Petroleum and Petroleum Products by Motor Carriers Within a Single State*, 71 M.C.C. 17, 29 (1957)). The test is stated in terms of what is not a fixed and persisting intent to ship goods in interstate commerce as follows:

> At the time of shipment there is no specific order being filled for a specific quantity of a given product to be moved through to a specific destination beyond the terminal storage, and (ii) the terminal storage is a distribution point or local marketing facility from which specific amounts of the product are sold or allocated, and (iii) transportation in the furtherance of this distribution within the single State is specifically arranged only after sale or allocation from storage.

---

[4] The authority previously vested in the ICC was transferred to the Department of Transportation ("DOT") in 1983. P.L. 97–449, 96 Stat. 2413, 2438 (1983).

29 C.F.R. § 782.7(b)(2). Subsequently, in 1992, the DOT issued the following updated factors ("1992 ICC Policy Statement") to be considered in determining "fixed and persisting intent" to continue in interstate commerce:

1. [Even if a] shipper does not know the ultimate destination of specific shipments, it bases its determination on the total volume to be shipped through the warehouse on projections of customer demand that have some factual basis, rather than a mere plan to solicit future sales within the State. [This may include], but is not limited to, historical sales in the State, actual present orders, [and] relevant market surveys of need.

2. No processing or substantial product modification of substance occurs at the warehouse or distribution center. However, repackaging or reconfiguring (secondary packaging) may be performed . . .

3. While in the warehouse, the merchandise is subject to the shipper's control and direction to the subsequent transportation.

4. Modern [tracking] systems allow tracking and documentation of most, if not all, of the shipments coming in and going out of the warehouse or distribution center.

5. The shipper or consignee must bear the ultimate payment for transportation charges even if the warehouse or distribution center directly pays the transportation charges to the carrier.

6. The warehouse utilized is owned by the shipper.

7. The shipments move through the warehouse pursuant to a storage in transit provision.

57 Fed.Reg. at 19813; *see also Policy Statement-Motor Carrier Interstate Transportation-from Out-of-State Through Warehouses to Points in Same State*, 8 I.C.C.2d 470, 473 (I.C.C. Apr. 27, 1992). The DOT additionally announced that "the presence of one or more of the following factors [would not be] sufficient to . . . change the interstate character of . . . subsequent transportation" from a warehouse:

1. The shipper's lack of knowledge of the specific, ultimate destination or consignee at the time the shipment leaves its out-of-State origin;

2. Separate bills of lading for the inbound and outbound movements instead of through bills of lading;

3. Storage-in-transit tariff provisions;

4. Storage receipts issued by the warehouse distribution center;

5. Time limitations on storage;

6. Payment of transportation charges by [the] warehouse or distribution center, when the shipper or consignee is ultimately billed for these charges;

7. Routing of the outbound shipment by the warehouse or distribution center;

8. A change in carriers or transportation modes at the distribution facility;

9. Use of brokers retained by the shipper;

10. Use of a warehouse not owned by the shipper.

57 Fed.Reg. at 19813; *see also* Opinion Letter Fair Labor Standards Act (FLSA), 2005 WL 330602, *2 (U.S. Dep't of Labor Jan. 11, 2005) (explaining that the DOT criteria outlined in the 1992 ICC Policy Statement above applies for determining "fixed and persisting intent" of a shipper when goods are moving from storage facilities "to points in the same State after or preceding a movement from another State").

Plaintiffs primarily argue that the gasoline was processed or substantially modified between the time it arrived at Port Everglades and the time it was delivered to Defendant CWC's customers by chemical marker additives (DE 68, ¶¶ 5-9). Thus, Plaintiffs argue, there could be no "fixed and persisting intent" (and thus no interstate commerce) because the second factor in the 1992 ICC Policy Statement – that "[n]o processing or substantial product modification . . . occurs at the warehouse or distribution center" – would be unsatisfied. *See* DE 60 at ¶¶ 9-10, 12-15; 57 Fed.Reg. at 19813. Defendants, conversely, disagree that the chemical marker additives substantially modify the gasoline. Defendants cite *Advantage Tank* for the proposition that the

additives do not substantially modify the gasoline (DE 61 at 11).  *See Advantage Tank Lines, Inc.-Petition for Declaratory Order-Ex-Pipeline Movements*, 10 I.C.C.2d 64, 75 (I.C.C. Mar. 4, 1994) (finding that adding ethanol and detergent additives to gasoline did not substantially modify it because the product is, essentially, "gasoline in, gasoline out").  Plaintiffs argue, however, that *Advantage Tank* does not apply because: (1) the ICC's opinion in *Advantage Tank* was limited to the facts presented there; (2) the shipper controlled the product in *Advantage Tank* from the time it was sent to the storage facility to the time it reached the final destination; and (3) the introduction of additives in *Advantage Tank* did not "define" the product to make it saleable.  *See* DE 68 at 3-5 (citing generally *Advantage Tank Lines, Inc.*, 10 I.C.C.2d at 64).

The Court finds that Plaintiffs' arguments are unavailing.  First, while the ICC's opinion was limited to the facts stated, those facts included various commentators' common argument that "blending ethanol with gasoline constitutes substantial processing because it changes the chemical composition and the basic character of the involved product."  *Advantage Tank Lines, Inc.*, 10 I.C.C. 2d at 66, 71.  In response to the assertion that the "ethanol blending process substantially changes the product," the ICC clearly stated that "the addition of ethanol and detergent additives … [did not] constitute substantial product modification."  *Id.* at 75.  Second, the shipper's control over the product is irrelevant to whether gasoline is substantially modified by ethanol and detergent additives.  One circumstance simply has no bearing on the other.  Furthermore, Plaintiffs fail to establish that the shippers in this case do not control the gasoline.  Third, Plaintiffs' argument that the ethanol and detergent additives in *Advantage Tank* did not define the product to make it saleable rings hollow.  *Advantage Tank* did not specifically state whether the additives it addressed made the product saleable.  *See generally Advantage Tank Lines, Inc.*, 10 I.C.C. 2d at 64.  In Defendants' Expert Report, however, from which Plaintiffs quote for other purposes, Defendants'

Expert explains that some major oil companies invest in proprietary detergent additives that they then use to market their brand (DE 60-3 at 6). These detergent additives, which *Advantage Tank* held did not substantially modify the gasoline, are no less involved in making the gasoline saleable as a particular brand than the chemical marker additives. Therefore, the Court concludes that the addition of chemical marker additives does not constitute "processing or substantial product modification" and does not prevent the MCA from applying.

### B.    Defendants' MSJ

Defendants' MSJ establishes that the MCA exemption applies for reasons set forth as follows. First, it is undisputed that Plaintiffs' activities as truck drivers affected the safe operation of motor vehicles on the public highways (DE 61 at 6; DE 67, ¶ 13). Second, Defendants argue that Defendant CWC is a "motor carrier" subject to the jurisdiction of the Secretary of the DOT as established by the U.S. DOT Number issued to Defendant CWC and the DOT's issuance of a Hazardous Materials Certificate of Registration to Defendant CWC. *See* DE 61 at 5-6 (citing *Walters*, 575 F.3d at 1227 ("[T]he fact that a company holds these kind[s] of authorizations indicates that the DOT has exercised jurisdiction over it.")). Defendants additionally argue that it is undisputed that Defendant CWC "is a motor carrier that transports petroleum products for hire to destinations within and outside the State of Florida" (DE 69 at 6).

Plaintiffs' response argues that it is not enough that Defendant CWC's business is subject to the MCA exemption through the Secretary's jurisdiction; rather, Plaintiffs argue that the Plaintiffs as employees must also fall within the exemption. *See* DE 67, ¶¶ 10-11 (citing *Nicholson v. World Bus. Network, Inc.*, 105 F.3d 1361, 1364 (11th Cir. 1997) (quoting *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945))). According to Plaintiffs, "[t]he Secretary's jurisdiction extends only to drivers who reasonably could be expected to make one of the carrier's interstate

runs," and there is no evidence that Plaintiffs ever made interstate runs.  *Id.* at ¶¶ 10-14 (citing *Morrison v. Quality Transp. Servs., Inc.*, 474 F. Supp. 2d 1303, 1309 (S.D. Fla. 2007) (internal quotations and citations omitted).  Plaintiffs argue that, under *Morrison*, Defendant CWC must show that it engaged in interstate commerce within a reasonable time—four (4) months—before it failed to pay Plaintiffs overtime.  *Id.* at ¶ 14, n. 3 (citing *Morrison*, 474 F. Supp. 2d at 1312).

The Court finds that Plaintiffs' argument conflates the exemption's requirements.  One requirement is that the defendant employer must be a carrier that is covered by the Motor Carrier Act.  The Court finds that Defendants successfully argue that the undisputed facts establish that Defendant CWC meets this requirement because it transports product for hire to destinations within and outside of Florida and is subject to the jurisdiction of the Secretary of the DOT (DE 69 at 5-6).  A separate requirement is that the plaintiffs/employees of such a defendant carrier must be engaged in interstate commerce.

As Plaintiffs' response summarizes, "[t]he real crux of the application—or not—of the [MCA exemption in this case] is whether the Plaintiffs were engaged in interstate commerce" (DE 67, ¶ 13).  While Plaintiffs argue that they only ever engaged in intrastate deliveries, the exemption is satisfied where a motor carrier employee is engaged as a driver on purely intrastate runs that are part of an interstate movement of goods so as to constitute interstate commerce.  29 C.F.R. § 782.7(b)(1) and (2).

Defendants argue that the gasoline that Plaintiffs transported intrastate for Defendant CWC was in a continuous stream of commerce (DE 61 at 2, 12).  Specifically, Defendants claim that the undisputed facts demonstrate, pursuant to the 1992 ICC Policy Statement factors, that the shippers' fixed and persisting intent was to ship goods in interstate commerce (DE 61 at 7-12; DE 69 at 7-11) (citing *Ehrlich*, 767 F. App'x 845 at 848-49).  *See also Ehrlich v. Rich Prod. Corp.*, No. 8:16-

CV-3532-T-24TGW, 2018 WL 2017532, at *6 (M.D. Fla. May 1, 2018), *aff'd*, 767 F. App'x 845 (11th Cir. 2019) (stating that "[w]hether the shipper has a 'fixed and persisting intent' that the merchandise continue in interstate...commerce from or to an out-of-State origin or destination, via a warehouse...is ascertained from all the facts and circumstances surrounding the transportation") (citation omitted). Accordingly, the Court turns to Defendants' arguments by factor:

> i.    **(1) Whether total volume to be shipped through the warehouse is predicated on projections of customer demand that have some factual basis**

Defendants argue that, pursuant to the Supply Agreements between Defendant CWC's customers and the oil companies that ship the gasoline from out-of-state to Port Everglades, the oil companies have an actual present order for the gasoline that they send into Florida (DE 61 at 9-10). Defendants explain that this is the case because Defendant CWC's customers are contractually obligated to deliver the gasoline to the retail gasoline stations listed in the Supply Agreements. *Id.* at 10. In turn, the Supply Agreements specify a monthly minimum volume of gasoline to be purchased based on customer demand projections that are determined using historical sales of gasoline in Florida during the same time of the year. *Id.* Plaintiffs, however, dispute that there are actual present orders before the oil companies for the gasoline prior to the oil companies shipping it to Florida (DE 66, ¶20). Rather, say Plaintiffs, there is no competent evidence in the record of oil company practice pertaining to the timing of their shipments or of any other oil company practices (DE 66, ¶20). As the parties acknowledge, establishing that a shipper has a factual basis for predicting out-of-state sales may establish that shipper's fixed and persistent intent relative to the product(s) shipped (DE 61 at 9-10; DE 67, ¶ 16). *Giovagnorio v. Am. Recovery Specialists of Orlando, Inc.*, No. 609CV1561ORL35GJK, 2011 WL 13118040, at *7 (M.D. Fla. Dec. 20, 2011) ("Fixed and persisting intent may be established if the shipper has a

factual basis for projecting out-of-state sales, rather than a mere plan to solicit sales out-of-state.") (citing 57 Fed.Reg. at 19813).

Here, there is evidence to support that the volume of product that the oil companies ship is based on historical demand if not actual orders.  It is undisputed that major oil companies deliver gasoline to Port Everglades based on Supply Agreements with jobbers and "big box" purchasers that are customers of Defendant CWC (DE 62, ¶¶ 14, 17; DE 66 ¶¶ 14, 17).  The Supply Agreements require the purchase of a minimum volume of gasoline (DE 62 ¶ 19; DE 66 ¶ 19). The minimum volume of gasoline to be purchased pursuant to the Supply Agreements is based on projections that are derived from historical sales of gasoline in Florida during the same time of the year (DE 69 at 8; DE 62, ¶¶ 19, 24; DE 66, ¶¶ 19, 24).  The Supply Agreements list the Florida retail gasoline stations to whom Defendant CWC's customer(s) will sell the gasoline that they purchase and also give the oil companies rights to monitor that the gasoline is actually delivered to those retail gasoline stations (DE 62, ¶¶ 20, 28-31; DE 66, ¶¶ 20, 28-31).  This combination of minimum purchase amounts and the requirement that the Defendants' customers sell to particular retail gasoline stations means that the shipping oil companies are not shipping gasoline with an aspirational "mere plan to solicit future sales within" Florida.  *See* 57 Fed. Reg. at 19813.  Rather they do so with a factual basis for how much gasoline will be sold and to whom it will be sold.

Additionally, Defendants' Expert Report, quoted for other purposes by Plaintiffs, further supports how the Supply Agreements inform the oil companies' determination as to the volume of gasoline to ship and states that: (1) "oil companies begin reserving or nominating delivery dates up to 30 days in advance of the actual delivery [of gasoline to Port Everglades];" and,  (2) oil companies "nominate gasoline parcels for delivery to the distribution terminals" based upon existing supply contracts with jobbers and big box customers (DE 60-3 at 3).  Given that the

16

undisputed facts indicate: (1) that the Supply Agreements inform the amount of product that the oil companies ship; and, (2) that the minimum volume specified in the Supply Agreements is based on historical sales, the Court finds that the oil companies ship gasoline to Port Everglades based upon a factual basis for predicting customer demand.  Therefore, the first factor weighs in favor of finding that the Plaintiffs were involved in interstate commerce.

        **ii.**        **(2) Whether processing or substantial product modification of substance occurs at the warehouse or distribution center**

Having concluded previously that the chemical marker additives do not substantially modify the gasoline, the Court does not here repeat the parties' arguments in this regard. Accordingly, the Court finds that the second factor also weighs in favor of Defendant CWC.

        **iii.**        **(3) Whether, while in the warehouse, the merchandise is subject to the shipper's control and direction to the subsequent transportation; (4) Whether modern [tracking] systems allow tracking and documentation of most, if not all, of the shipments coming in and going out of the warehouse or distribution center; and (6) Whether the warehouse utilized is owned by the shipper**

Defendants argue that the third, fourth, and sixth factors weigh in their favor because: (a) the oil companies shipping gasoline into Florida lease capacity for storing it at the fuel terminals designated in the Supply Agreements, (b) the oil companies are able to limit Defendant CWC's customers' ability to pull gasoline from the fuel terminals if they pull more than the maximum amount specified in the Supply Agreements, and (c) a bill of lading was generated specifying the precise quantity of gasoline that Plaintiffs pulled from the fuel terminals (DE 61 at 11-12). "Plaintiffs do not dispute that Defendants and the shippers employ various means to track the product transported" (DE 67, ¶ 16).  Because it is also undisputed that: (1) the oil companies can monitor and limit the quantity of gasoline pulled from the fuel terminals (DE 62, ¶¶ 25-26; DE 66, ¶¶ 25-26); (2) the oil companies specify, and have the right to monitor, through their Supply

Agreements where the gasoline gets delivered (DE 62, ¶¶ 20, 28-29, 31-34; DE 66, ¶¶ 20, 28-29, 31-34); and (3) the oil companies lease storage capacity for gasoline at fuel distribution terminals within the Port Everglades facility,[5] the Court agrees that the third, fourth, and sixth factors weigh in favor of the Defendants.

        **iv.**      **(5) Whether the shipper or consignee bears the ultimate payment for transportation charges even if the warehouse or distribution center directly pays the transportation charges to the carrier**

Although Defendants do not make the argument in their MSJ, it is undisputed that Defendant CWC's customers bear the ultimate payment for transportation charges.  (DE 62, ¶10; DE 66, ¶10).  Accordingly, the Court finds that this factor weighs in favor of Defendant CWC.

        **v.**      **(7) Whether the shipments move through the warehouse pursuant to a storage in transit provision**

Neither Defendants nor Plaintiffs address this factor, and the Court is unable to make a determination relative to this factor based upon the record evidence.

        **vi.**      **Summary as to 1992 ICC Policy Statement Factors**

Six of the seven factors outlined in the 1992 ICC Policy Statement weigh in Defendants' favor, supporting the idea that the shippers have a fixed and persisting intent at the time of shipment to move the gasoline through the Port Everglades facilities rather than to allow it to languish there, and thereby showing that the gasoline remains in the flow of interstate commerce.  Thus, because Plaintiffs transport the gasoline within the flow of interstate commerce, the Court finds that Defendants meet their burden to show that the MCA exemption applies.

---

[5] The Plaintiffs only dispute the record reference and not the fact that oil companies lease storage capacity.  *See* DE 60-3, ¶¶ 11-13; DE 62-3, ¶¶ 11-13; DE 62, ¶ 22; DE 66, ¶ 22.

**IV.     Conclusion**

Accordingly, for the reasons stated, it is hereby **ORDERED** and **ADJUDGED** as follows:

1.      Plaintiffs' Motion for Partial Summary Judgment (DE 60) is **DENIED**;

2.      Defendants' Motion for Final Summary Judgment with Incorporated Memorandum of Law (DE 61) is **GRANTED**;

3.      Plaintiffs' Motion to Deem Timely its reply to Defendants' response to its statement of facts (DE 72) is **GRANTED**[6]; and

4.      Defendants' Motion to Strike Plaintiffs' Reply Statement of Material Facts with Incorporated Memorandum of Law (DE 73) is **DENIED**.

     **DONE AND ORDERED** in Chambers at Fort Lauderdale, Florida, this 2nd day of March, 2020.

*Jared Strauss*

Jared M. Strauss
**United States Magistrate Judge**

Copies furnished to Counsel via CM/ECF

---

[6] Plaintiffs explained that their late filing by five days—two of which were a weekend and one of which was a federal holiday—was due to a miscommunication with new office staff (DE 72 at 1). The Court determined that granting Plaintiffs' Motion to Deem Timely caused no prejudice to Defendants.